# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| TIMOTHY MCNALLY, | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | )      **CIVIL ACTION** |
| | ) |
| | )      **No. 04-2474-CM** |
| | ) |
| STATE FARM FIRE & CASUALTY CO., | ) |
| | ) |
| **Defendant.** | ) |
| | ) |

## MEMORANDUM AND ORDER

Plaintiff initially brought the instant action against State Farm Mutual Automobile Insurance Company in the District Court of Crawford County, Kansas, on September 2, 2004. In his state court petition, plaintiff alleged breach of contract, bad faith/breach of fiduciary notice, and bad faith/breach of fiduciary duty claims arising out of an issue over the existence of uninsured motorist coverage in plaintiff's automobile insurance policy with State Farm Mutual Automobile Insurance Company after plaintiff was involved in a motorcycle accident with an uninsured motorist on September 2, 2002. State Farm Mutual Automobile Insurance Company removed the state court action to this court on September 28, 2004. On January 5, 2005, plaintiff filed an amended complaint adding State Farm Fire & Casualty Company as a defendant and stating that the breach of contract action arose out of a personal lines umbrella insurance policy issued by State Farm Fire & Casualty Company to plaintiff.

During the pretrial conference held on July 21, 2005, plaintiff abandoned his claims for bad faith/breach of fiduciary notice (Count II) and bad faith/breach of fiduciary duty (Count III) and stated his intent to proceed only on his breach of contract claim (Count I). Accordingly, pursuant to the pretrial order entered on August 1, 2005, plaintiff's remaining claim for determination is his

breach of contract claim (Count 1).[1]  This matter comes before the court on defendant State Farm Fire & Casualty Company's[2] Motion for Summary Judgment (Doc. 45).  For the reasons set forth below, the court grants defendant's Motion.

I.      Facts[3]

        A.      Plaintiff's Background

        Plaintiff is an educated, experienced businessman.  He received his Bachelor of Science, Business Administration, from Pittsburg State University in 1975.  In approximately 1975, plaintiff completed a six-month independent study in economics in London, England, at the London School of Economics.  Plaintiff has worked at Hix Corporation as a sales manager for approximately two years.  Prior to working at Hix Corporation, plaintiff worked for twelve or thirteen years as the vice president and general manager of a Swedish manufacturing company named Svedala.  Prior to working at Svedala, plaintiff had an ownership interest in a family-owned company named McNally Incorporated.  Plaintiff worked at McNally Incorporated for more than twenty years.

        Plaintiff is currently the chairman of the board of trustees for Mt. Carmel Hospital.  His responsibilities include reviewing all of the hospital's employment and business contracts "to keep

---

[1]The pretrial order supercedes all prior pleadings, establishes the issues to be considered at trial, and controls "the subsequent course of the action unless modified by a subsequent order."  Fed. R. Civ. P. 16(e); *Wilson v. Muckala*, 303 F.3d 1207, 1215-16 (10th Cir. 2002).

[2]Both State Farm Mutual Automobile Insurance Company and State Farm Fire & Casualty Company were defendants in this case and the summary judgment motion was originally filed on behalf of both defendants.  On August 17, 2005, plaintiff and defendant State Farm Mutual Automobile Insurance Company stipulated to the dismissal of the cause of action without prejudice against State Farm Mutual Automobile Insurance Company.  Accordingly, the court considers the summary judgment motion on behalf of the remaining defendant, State Farm Fire & Casualty Company, only.

[3]The court construes the facts in the light most favorable to plaintiff as the nonmoving party pursuant to Fed. R. Civ. P. 56.

the hospital safe from litigation," making sure the financials look good, making sure the management team is doing its job properly, reviewing any capital appropriations, and giving management advice to the management team if needed.  Plaintiff has also been active in a couple of committees for the local chamber of commerce.

Plaintiff has spent many years in the business world drafting and signing contracts.  In the business world, plaintiff would want to know what he was signing before he signed it.  In the business world, if plaintiff read language that caused him to wonder what it said or what it meant, he would ask questions.  However, in his business dealings, plaintiff has not been involved in any of the insurance purchases and has never read any of the insurance policies or dealt with the details of insurance coverage of his employers.  In relation to his personal automobile insurance, plaintiff testified that he would ask the insurance agent what he needed, and how much it was going to cost, and he paid the bill.  Plaintiff contends that he always trusted his insurance agent to make sure plaintiff had the right coverage.

### B.    Plaintiff's Insurance Policies with Defendant

During his lifetime, plaintiff has purchased several types of insurance policies from defendant, including automobile, motorcycle, and one umbrella policy.

On approximately November 10, 1988, plaintiff told his friend and insurance agent, Francis Buche,[4] that he wanted to take out an umbrella insurance policy.  Buche assisted plaintiff in preparing a personal liability umbrella application with defendant.  At the time of the application, plaintiff had three vehicles he owned or used for personal or business reasons: 1987 Ford Aerostar, 1980 Chevy Blazer, and a 1986 Olds.

---

[4] Buche is an agent with a local office of defendant.

Plaintiff and his wife were the only two drivers in plaintiff's household at the time of this application in 1988.  Plaintiff knew that he was purchasing an umbrella policy with $1 million liability limits to protect him and his wife if a claim were made against them.  Plaintiff does not remember any discussion with Buche or anyone at his State Farm Agency about uninsured motorist coverage at the time plaintiff took out this umbrella policy.

The only handwriting on the application that is plaintiff's is the signature.  Typically, Buche would tell plaintiff where to sign, and plaintiff would sign where Buche indicated.  In plaintiff's deposition, the rejection language on this application was pointed out to him:

REJECTION OF UNINSURED MOTOR VEHICLE COVERAGE

In keeping with the laws of my state, I have been offered the opportunity to purchase Uninsured/Underinsured Motorist Coverage, and I hereby reject the opportunity to purchase this option as part of this application.

Applicant's Signature x_____

Plaintiff did not sign this rejection of uninsured motor vehicle coverage on the application.  Buche testified that when plaintiff purchased the umbrella policy in 1988, Buche would have explained uninsured motorist coverage to plaintiff at that time.  The personal liability umbrella application lists the premium for "uninsured motor vehicle" as $25.00.  Plaintiff paid the total premium of $130.00 shown on the application.

In November 1988, after plaintiff submitted his application, defendant issued a personal lines umbrella policy, policy number 16-B36787-2 (the "umbrella policy"), to plaintiff.  The umbrella policy was a twelve-month policy which provided for automatic renewal "subject to the premiums, rules and forms in effect for each succeeding policy period."  Plaintiff received premium notices and timely paid each premium on the policy from 1988 to the present.

-4-

When issued in 1988, the umbrella policy provided two endorsements of coverage:  (1) $1 million in personal liability coverage, and (2) $1 million in uninsured/underinsured motorist coverage.  Plaintiff does not have a copy of a "declarations"sheet, which he believes would have been mailed to him with this policy in 1988.  Plaintiff does not have a copy of endorsement "FE-7655.1 Uninsured Motor Vehicle Coverage."  Plaintiff contends that, prior to this lawsuit, he had never seen or read defendant endorsement "FE-7655.1 Uninsured Motor Vehicle Coverage." However, plaintiff testified that he was aware of what the uninsured/underinsured coverage was when he first purchased the umbrella policy:

> Q. Do you recall when you first purchased the umbrella policy for a million dollars whether you knew what uninsured coverage was?
>
> A. In regards to my automobile policies?
>
> Q. Yes.
>
> A. In regards to my automobile policies my understanding of uninsured or underinsured coverage was that if someone ran into me and they didn't have coverage, then State Farm would cover the damage to my vehicles.
>
> Q. So you understood it just to be your vehicles and not for personal injury?
>
> A. Well, if anybody got hurt, they'd pay the hospital bills.

**C.      Plaintiff's 1989 Increase of His Coverage Under the Umbrella Policy**

In November 1989, plaintiff contacted Buche, and requested that he increase the umbrella policy "another million."  Plaintiff's desire to increase the limits of the umbrella policy was prompted by a significant increase in his assets following the sale of a business interest he owned.

At his deposition, plaintiff produced an original document signed by Buche and dated November 8, 1989.  This document is an amended declarations page for the umbrella policy.  The

amended declarations page shows that, beginning in 1989, the umbrella policy was amended to increase the limits of the policy to $2 million.

The November 1989 amended declarations page provided that the umbrella policy was subject to the following endorsements: FP-7950.1 personal liability umbrella, and FE-7655.1 uninsured motor vehicle coverage.  Plaintiff contends that what "FE-7655.1" meant was never explained to plaintiff by Buche or anyone at his agency.  The November 1989 amended declarations page also provided that, for the 1989 renewal period, plaintiff had $2 million in liability policy limits and $2 million in "Coverage U – 4 Uninsured (Inc. Underinsured)" policy limits.

When plaintiff received policy notices, such as the November 1989 amended declarations page, he typically did not read them.  Instead, he tore off the bottom, put a check in the mail and either threw away the notices or put them in a file.  In plaintiff's documents from defendant, plaintiff has the original document signed by Buche and dated November 8, 1989, which states it is an amended declarations page for the umbrella policy.

Plaintiff did not understand what uninsured/underinsured motorist coverage of $2 million meant to him on the November 1989 amended declarations page (or the premium notice) when he received it.  Plaintiff testified as follows with regard to his understanding of the umbrella policy in 1989:

> Q.  What did you understand at that point in time your umbrella policy provided you in the way of protection?
>
> A.  That if something – if I caused some accident or if someone – if I caused some accident, one of my kids caused some accident and someone had some right to sue us or someone got hurt on my home – you know, on my property or on my land I owned in the country that I would have liability coverage up to two million dollars if someone wanted to sue me, had some reason to sue me.

For the twelve-month period from November 10, 1992 to November 10, 1993, plaintiff paid $201.00 for his $2 million umbrella liability and uninsured/underinsured motorist coverage.

On November 10, 1992, the potential drivers of vehicles insured under plaintiff's automobile policies with defendant were: Timothy McNally, Christi McNally, and Edward [Cappy] McNally, one of plaintiff's teenage sons.

### D.     Change to Plaintiff's Umbrella Policy in 1993

Defendant's premium summary listing of umbrella premiums states that, for the twelve-month period from November 10, 1993 to November 10, 1994, plaintiff was initially quoted an umbrella premium of $533.00 for his $2 million umbrella liability and uninsured/underinsured motorist coverage.  That amount was more than double plaintiff's previous year's premium, an increase of $332.00 over the prior twelve-month policy period.  At that time, potential drivers of vehicles insured under plaintiff's policies were: Timothy McNally, Christi McNally, and two of plaintiff's teenage sons, Edward [Cappy] McNally, and Matthew McNally.

As a result, sometime in 1993 after plaintiff received the $533.00 premium billing, plaintiff contacted Buche about the premiums he was paying for the umbrella policy.  Plaintiff testified as follows:

> Q.  (By Mr. West)  So you never informed Mr. Buche that you did not want a specific coverage because you didn't want to pay the premiums?
>
> A.  I did not inform him that I didn't want a specific coverage because I didn't want to pay the premiums?
>
> Q.  Right.
>
> A.  I asked [Buche] in the early nineties why the umbrella policy premium had gone up so much from one year to the next and his response was "Because you got more kids driving." And I said, "Well, is there anything we can do to reduce that?"  Because I was always conscious of how much premiums I paid.  He called back and said, "Well, we can do such-and-such if you come and sign a form."

Q.  What did he tell you, what was the such-and such?

A.  He said, "There's some coverage on that policy that we can reduce the cost of if you sign a form."  That was – that's all I remember about that part of the discussion.

Q.  You don't recall that he specifically talked about uninsured/underinsured?

A.  If he mentioned it, I don't recall that that's what he mentioned, no.

After his 1993 conversation with Buche, plaintiff received from Buche's office a document dated September 30, 1993 (the "September 1993 form").  The September 1993 form references the umbrella policy number, 16-B36787-2 F, the endorsement number, FE–7655.1, and "Pers Liab Umb."  The September 1993 form provides that its effective date is November 1, 1993.  Defendant contends that the September 1993 form is a document signed by plaintiff stating his intent to "delete" the uninsured/underinsured motorist endorsement from the umbrella policy.  Buche also testified that the September 1993 form was a request by plaintiff "to cancel his personal liability umbrella underinsured/uninsured motorist coverage."

The September 1993 form provides, in part:

**Options and Endorsements**
DELETE: (FE – 7655.1)

RO REMARKS: (Eric---Sorry About That—Please Cancel at Renewal (Thanks)

Remarks Apply to: Fire

While plaintiff does not controvert that this language appears on the September 1993 form, he contends that he did not know what FE-7655.1 meant, that it was not explained to him at any point, and that he never seen form FE-7655.1 until after September 2, 2002.

Plaintiff was given an opportunity to read the September 1993 form before he signed it.  Plaintiff testified:

Q. Exhibit Number 1 [the September 1993 form] says you're deleting something from your personal liability umbrella policy, correct?

A. That's what it says, yes.

Q. And when you signed this or by signing this you were deleting something from that policy, were you not?

A. Evidently.

Plaintiff contends that he was not informed and did not know that he was deleting uninsured/ underinsured motorist insurance coverage from his umbrella policy. However, plaintiff signed the September 1993 form.

Plaintiff testified:

Q. So when you signed the document, Exhibit Number 1 [the September 1993 form], sometime during whenever this conversation took place, the document showing September 30, at least, 1993, at the top of it, you understood your liability policy was going to remain in place for the two million for what you wanted, which was to protect you if you got sued?

A. Yes.

Q. And that was your main concern for the umbrella is that you be protected so your assets that had increased during that time frame when you raised it to two million would be protected if someone sued you because of either something your wife did, your kids did or you did?

A. Correct.

Plaintiff further testified:

Q. So when you came in and signed that form what coverage did you want?

A. I wanted two million dollars of coverage to keep people from suing me and my automobile policies and homeowner's policies like I always had.

Q. So you were looking for the protection if someone sued you?

A. Yeah, that's what I thought it was.

With regard to the reduction in his premium in 1993, plaintiff testified:

Q.  So the company just doesn't – you understand the company just doesn't drop their premiums and give you the same coverage?

A.  Right.

Q.  So you knew something was going to happen to your policy for a reduction of about $200 in a premium, true?

A.  Yeah, I assumed something was going to happen.

Plaintiff further testified:

Q.  And why did you understand it was going to reduce the premium?

A.  I don't recall the exact discussion.  My understanding was that it had something to do with uninsured motorist coverage.[5]

Q.  Okay.  But as we sit here today, you don't recall what he may have told you at that time?

A.  No.  If he'd have talked to me about tying into two million dollars worth of coverage I would have said, "Wait a minute, we got to talk about this."  And I don't recall any discussions about it tying into any of the over coverage protecting me or my kids.

Q.  Well, did you ask him?

A.  No.  I always trusted him to make sure I had the right coverage.

---

[5] Plaintiff later clarified this deposition testimony by noting on the correction sheets:

> I don't remember Buche telling me it was uninsured motorist coverage we were taking off the policy.  I stated some assumptions based on what has been discussed since the accident and what I can remember from the past.  But I don't have any specific memory of the exact event and discussions.  This is a mis-statement, I really don't recall any discussion about what was being removed from the PLUP, it contradicted what I said prior to this.  I believe it is from reviewing all of the issues prior to the deposition that caused me to get confused.

The court lends little credibility to plaintiff's changes to his testimony.  In response to more than one question at his deposition, plaintiff stated that his discussion with Buche about reducing his premium in 1993 had something to do with uninsured/underinsured motorist coverage but that he couldn't recall specifically what.

At the same deposition, plaintiff further testified:

> Q.  (By Mr. West)  Well, I want to know what you specifically recall what he told you in regards to how to reduce your premium on the umbrella policy.
>
> A.  I don't recall the exact conversation.
>
> Q.  Okay.
>
> A.  And I don't recall – I mean, I don't even recall him saying it was the uninsured.  If he had of, in my mind I probably would have thought, well, I got uninsured coverage, I don't -- probably didn't understand it.  He said, "You can reduce it that way," and I went down and signed a form and that was the end of it.
>
> Q.  Well, what did you understand you were signing when you signed the form?
>
> A.  That it was going to reduce the premium by whatever dollars it was.  And he seemed to think that that was all right.

Plaintiff also testified:

> Q.  Did you have an understanding when you signed that form that you thought you still were going to have two million dollars to protect you if you got hit by an uninsured or underinsured motorist?
>
> A.  I didn't know that it covered that.

After plaintiff signed the September 1993 form, defendant deleted the uninsured/underinsured motorist endorsement from the umbrella policy.  Defendant also reduced plaintiff's premium from $533.00 to $335.00.

Buche does not have any specific recollection of the circumstances surrounding plaintiff's signing of the September 1993 form.

### E.    Plaintiff's Umbrella Policy from 1993 - 2003

Each year, from 1993 to 2003, the umbrella policy was automatically renewed.  Plaintiff received premium notices and timely paid each premium, and the policy continued in force from 1988 to the present.  Each year, from 1993 to 2003, defendant sent plaintiff a renewal certificate

stating, among other things, the endorsements under the umbrella policy and the amount of plaintiff's premium for the umbrella policy.  Plaintiff does not deny that he received the notices, but presumes that this notice was in the form of a premium due billing and states that he does not have a copy of the documents he received.  Each year, from 1993 to 2003, plaintiff paid defendant the premium requested in that year's renewal certificate for the umbrella policy.[6]  The umbrella policy premium paid by plaintiff from 1993 to 2003 did not include any amount for uninsured/underinsured motorist coverage.

In addition to stating the premium owed, the renewal certificates sent to plaintiff each year from 1993 to 2003 also stated the coverage endorsements provided under the umbrella policy.  The renewal certificates sent to plaintiff each year from 1993 to 2003 did not include a coverage endorsement for uninsured/underinsured motorist coverage.  None of the renewal certificates issued for the umbrella policy from 1993 to 2003 contained a reference to uninsured/underinsured motorist coverage.

Effective April 1, 1994, defendant stopped including FE-7655.1, uninsured/underinsured motor vehicle coverage, in Kansas on new business.  At that time, defendant "grandfathered in" uninsured/underinsured motorist coverage on existing Kansas personal liability umbrella policies with uninsured/underinsured motorist coverage, and customers were allowed to keep this coverage as long as they were willing to pay the extra premium.  Buche testified that he believed that if a person had underinsured/uninsured motorist coverage on an umbrella policy it would be a good idea to keep

---

[6] Plaintiff has indicated that he is willing to tender the additional premium owed for the uninsured/underinsured motorist coverage under the umbrella policy if defendant acknowledges or the court determines the existence of continuous uninsured/underinsured motorist coverage limits of $2 million under the umbrella policy from the date of the initial application.

it, even after defendant ceased writing uninsured/underinsured motorist coverage under its umbrella policies.

### F.     Plaintiff's 2002 Accident

On September 2, 2002, plaintiff was involved in a motorcycle versus automobile accident. Plaintiff sustained personal injuries due to the fault of Jonathan Fletchall, who was uninsured at the time of the accident.  On the date of the accident, the motorcycle plaintiff was operating was covered under primary policy no. 26 1282-F03-16.  Policy no. 26 1282-F03-16 included uninsured motorist coverage in the amount of $100,000.  Defendant paid plaintiff $100,000 in uninsured motorist benefits pursuant to policy no. 26 1282-F03-16.[7]  Plaintiff claims that, in addition, he is entitled to uninsured motorist benefits under the umbrella policy.  Defendant denied plaintiff's claim for uninsured motorist benefits under the umbrella policy.

Defendant has provided the court with the written umbrella policy that was in effect on September 2, 2002.  Nowhere does the written policy provide that uninsured/underinsured motorist coverage is included in the policy.  Nowhere does the written policy provide that it is subject to the uninsured/underinsured motorist endorsement (FE – 7655.1).

### G.     Plaintiff's Claim

Plaintiff contends that the original umbrella policy that was issued by defendant after plaintiff made his November 10, 1988 application, with limits of $1 million that subsequently were increased to $2 million, contained uninsured/underinsured motorist coverage.  Plaintiff contends that defendant never obtained a knowing or valid rejection or limitation of the uninsured/underinsured motorist coverage, and that it remained in effect at the time of the accident on September 2, 2002.

---

[7] Plaintiff clarified that defendant paid the $100,000 in uninsured motorist benefits to plaintiff's wife.  Plaintiff was still in a coma at the time of the payment.

Accordingly, plaintiff contends that defendant breached the parties' contract by not paying uninsured/underinsured motorist coverage under the umbrella policy.[8]

In its summary judgment motion, defendant contends that plaintiff's breach of contract claim fails because the umbrella policy did not include uninsured motorist benefits at the time of plaintiff's September 2, 2002 accident. Defendant points out that plaintiff's main concern with regard to the umbrella policy appeared to be that it would cover him and his family if someone sued them, which the umbrella policy always did.

## II.    Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* (citing *Anderson*, 477 U.S. at 248).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Id.* at 670-71. In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for

---

[8] Plaintiff has not produced a copy of an umbrella policy that included uninsured motorist coverage and was in effect on September 2, 2002.

the other party on an essential element of that party's claim.  *Id.* at 671 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 256; *see Adler*, 144 F.3d at 671 n.1 (concerning shifting burdens on summary judgment).  The nonmoving party may not simply rest upon its pleadings to satisfy its burden.  *Anderson*, 477 U.S. at 256.  Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."  *Adler*, 144 F.3d at 671.  "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein."  *Id.*

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut," rather, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'"  *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

**III.    Analysis**

Plaintiff contends that he did not make a knowledgeable rejection of the uninsured/ underinsured motorist coverage and that defendant did not receive a knowledgeable consent from plaintiff as required by Kan. Admin. Reg. 40-1-32 before removing the uninsured motorist coverage from plaintiff's umbrella policy.  Kan. Admin. Reg. 40-1-32 states:

> Consent of the policyholder is required if an endorsement or rider attached to an insurance contract or policy subsequent to the issuance date of such contract or policy reduces or eliminates coverage or benefits of the contract or policy.

*Id.*  Plaintiff argues that defendant did not comply with the rejection form provisions when it used his signature on the September 1993 form to delete the uninsured/ underinsured motorist coverage from

-15-

his umbrella policy.  Plaintiff further contends that defendant did not follow its own policies, which require specific rejection language for uninsured/underinsured motorist coverage, similar to the language plaintiff saw on his initial application for the umbrella policy.[9]

Plaintiff further contends that, if it had been explained to him that his umbrella policy provided him and his family $2 million of uninsured/underinsured motorist coverage if they were injured by the fault of someone who had no insurance or did not have enough insurance, and that this coverage only cost $200.00 per year, plaintiff would not have waived the uninsured/underinsured motorist coverage provided by his umbrella policy.  Plaintiff contends that when he signed the September 1993 form, he did not know that uninsured/underinsured motorist coverage was being deleted from his umbrella policy with defendant or the benefit of this coverage to his entire family.

Despite the fact that plaintiff: (1) had copies of the amended declarations page from 1989, showing that he had increased his policy limits to $2 million and which stated the endorsement for FE-7655.1 "uninsured motor vehicle cov"; and (2) had a copy of the subsequent September 1993 form, which he signed, that deleted the uninsured motorist coverage, plaintiff contends that, prior to his September 2, 2002 accident, he never knew what form FE-7655.1 was or that it contained provisions that provided uninsured/underinsured motorist coverage to his umbrella policy involved in this lawsuit.

First, however, as defendant points out, in 1988, Kan. Stat. Ann. § 40-284(a) was amended to specifically exclude umbrella policies from mandatory uninsured motorist coverage in Kansas.  At

_____

[9] The language to which plaintiff refers is: "In keeping with the laws of my state, I have been offered the opportunity to purchase Uninsured/Underinsured Motorist Coverage, and I hereby reject the opportunity to purchase this option as part of this application."

-16-

the time plaintiff purchased the umbrella policy in 1989, and to the present, K.S.A. § 40-284(a) has

provided that:

> No insurer shall be required to offer, provide or make available coverage conforming
> to this section [uninsured motorist coverage] in connection with any excess policy,
> umbrella policy or any other policy which does not provide primary motor vehicle
> insurance for liabilities arising out of the ownership, maintenance, operation or use of
> a specifically insured motor vehicle.

*Id*.  Section 40-284(a) clearly states that there is no requirement in Kansas that an insurer provide or

make available uninsured motorist coverage in an umbrella policy, especially in a case such as this

where plaintiff had a separate, primary insurance policy covering his vehicles.

Second, defendant contends, and the court agrees, that Kan. Admin. Reg. 40-1-32 does not

apply to this case because: (1) plaintiff voluntarily signed the September 1993 form, which served to

"delete" the uninsured/underinsured motorist endorsement from the umbrella policy; (2) Kan. Admin.

Reg. 40-1-32 states that it applies to situations where an endorsement or rider is "attached" to a policy

"subsequent" to the issuance of the policy resulting in the elimination or reduction of coverage, and

here there was no endorsement or rider "attached" to plaintiff's policy "subsequent" to the issuance of

the policy resulting in the elimination or reduction of coverage – rather, the endorsement providing the

uninsured/underinsured motorist coverage was deleted after plaintiff signed the September 1993 form;

and (3) Kan. Admin. Reg. 40-1-32 specifically provides that it was enacted for "implementing K.S.A.

40-928, 40-1113, 40-2404."  In fact, Kan. Stat. Ann. §§ 40-928 and 40-1113 were repealed in 1997.

Kan. Stat. Ann. § 40-2404 relates to unfair methods of competition or unfair and deceptive acts or

practices by an insurance carrier (which is not at issue in this case) and not to uninsured/ underinsured

motorist coverage.

The court finds that plaintiff has failed to demonstrate that defendant was required by any

Kansas statute or regulation to use any specific type of rejection form to delete uninsured/

-17-

underinsured motorist coverage in the umbrella policy – either in 1989 when he originally purchased his policy or in 1993 when he signed the form deleting the uninsured/underinsured motorist coverage from his umbrella policy.[10]

The court further finds that the uncontroverted facts, including plaintiff's own testimony, establish that plaintiff knew what uninsured/underinsured motorist coverage was when he first purchased the umbrella policy in 1989, and that plaintiff purposefully signed a document deleting uninsured motorist coverage from the umbrella policy in 1993, even though the September 1993 form did not contain an express provision stating that plaintiff was declining uninsured/underinsured motorist coverage on his umbrella policy. Plaintiff was provided with the September 1993 form because he wanted to reduce his premiums. Plaintiff testified that he knew that signing the September 1993 form would affect his coverage. It was plaintiff who requested that his premiums be reduced and it was plaintiff who signed the form "deleting" the uninsured motorist coverage endorsement. Not until more than ten years later did plaintiff claim that he did not realize he had deleted uninsured motorist coverage from his umbrella policy.

Kansas courts reviewing the parties' understanding of the terms of insurance policies have found:

> Generally, Kansas recognizes some obligation on the insured to review and understand an insurance policy. Moreover, a party seeking equitable relief must take reasonable action to protect his own interests. Generally, equity aids the vigilant and not those who slumber on their rights. A vigilant insured paying significant premiums should be expected to obtain and read a copy of the policy some time during the 3 years of its existence.

---

[10] It appears to the court that plaintiff could have verbally requested that the uninsured/underinsured motorist provision be deleted from his umbrella policy. No written document was required to remove the endorsement from his umbrella policy.

-18-

*Jones v. Reliable Sec. Incorp., Inc.*, 28 P.3d 1051, 1062 (Kan. App. 2001) (internal citations omitted). The facts in this case establish that plaintiff had uninsured/underinsured motorist coverage under his primary auto policy and that defendant paid those benefits.  The facts further establish that plaintiff signed a form that deleted the uninsured/underinsured motorist coverage endorsement from his umbrella policy in 1993 and did not inquire as to whether he had uninsured/underinsured motorist coverage until after his motorcycle accident in September 2002.  The court finds no ambiguity in the umbrella policy and no mistake by defendant as to the coverage under the policy.  Plaintiff's own ignorance of the coverage under his umbrella policy, which he failed to read or specifically discuss with his agent for approximately ten years before his motorcycle accident, is insufficient to prevent summary judgment on plaintiff's claim.  *Id*.

Accordingly, the court finds that plaintiff has failed to show that defendant was required to obtain any specific written waiver of his uninsured/underinsured motorist coverage contained in his umbrella policy, or that he should be entitled to uninsured/underinsured motorist coverage under the umbrella policy after failing to read the policy for a decade after he signed the form deleting the uninsured/underinsured motorist coverage.

**IT IS THEREFORE ORDERED** that defendant State Farm Fire & Casualty Company's Motion for Summary Judgment (Doc. 45) is granted.

Dated this ____ day of December 2005, at Kansas City, Kansas.

 __S/Carlos Murguia__
**CARLOS MURGUIA**
**United States District Judge**